The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oh yay, oh yay, oh yay. All persons who have any manner of form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to get their attention for the court is now sitting. God speed the United States and this Honorable Court. Our first case is number 20-1793 Graham v. Dhar. Mr. Byrd, are you there? Yes, Your Honor. Good to have you with us and you may proceed. Well, may it please the court. Good afternoon, Andrew Byrd here from Charleston, West Virginia, on behalf of the appellant, Janet Graham, Administrator of the Estate of Edna McNeely. The privilege is yours, Your Honor. The issue in this case is narrow. Did the district court err in its interpretation and application of the West Virginia Medical Professional Liability Act's loss of chance statute? Now, on behalf of the appellant, we respectfully submit that the answer to this question is yes. So, my job here today is to provide the court with the roadmap of how we get there. So, to start today, there are some brief but important facts that need to be discussed with the court. Ms. McNeely was admitted to Appellee Bluefield Regional Medical Center and underwent a cardiac catheterization procedure, which was performed by underlying defendant, Dr. Dhar. Now, following the procedure, Ms. McNeely's condition began to deteriorate and a CT scan confirmed a retroperitoneal bleed. Now, what's important to note to this court is that the appellee does not have the capabilities for on-site cardiac surgical backup to address this scenario. So, Ms. McNeely had to be transferred to Roanoke Memorial Hospital for surgical intervention. Now, the key facts that surround this case is the timing of the transfer of Ms. McNeely, which can be found in two medical records in the record before this court. That involved flying a helicopter from Bluefield to Roanoke? Absolutely, Judge King. First, though, there was a patient care activity medical record that shows that the decision and contact by the appellee to Roanoke to say, hey, we need to transfer Ms. McNeely was at 9.35 p.m., and you can find that at page 129 in the appendix. Now, Ms. McNeely was to be transported within an hour of that time frame, but for some reason, she was not transported until 12.24 a.m. and did not arrive at Roanoke Memorial Hospital until 12.53 a.m. Now, unfortunately, Ms. McNeely passed away as a result of septic shock due to that retroperitoneal bleed. Now, the appellant's expert, Dr. Scott DiNardo, which is an interventional cardiologist out of he opined that the appellee breached the standard of care by failing to follow what's called the West Virginia Cardiac Catheterization Standards, which are implemented by the West Virginia Health Care Authority. Now, those standards state that in a situation like Ms. McNeely, she needs to be transferred within one hour of contact made by the appellee to Roanoke Memorial Hospital, which is the facility with on-site backup surgical procedures, and that this time period cannot be extended unless the health care authority's board approves it. Now, in his deposition, your honors, Dr. DiNardo was asked about the probability... Counsel, can I ask you a question? Yes, your honor. You mentioned at the beginning of your argument that this case has a narrow question about the interpretation. If you prove that Ms. McNeely had a greater than 25% chance of survival, if the doctors did everything right, so if you prove that she had a greater than 25% chance of survival, if everything had gone correctly, what's next? Well, your honor, to take your question, we have to look at the practical sense of how this would be before a jury. See, in the Medical Professional Liability Act, what your question relates to is the special interrogatories that would be presented to the jury. So there'd be three. One would be, did VRMC or the appellee breach the standard of care? The second one would be, do you find by preponderance of the evidence, and I'll read for the statute, your honor, that the failure to follow the accepted standard of care deprived the patient of a chance of survival, or increased the risk of harm to the patient? And then special interrogatory number three would be, to a reasonable degree of medical probability, do you find by the preponderance of the evidence that following the accepted standard of care would have resulted in a greater than 25% chance that the patient would have survived in this case? Because this is a case of survivability, because it's a wrongful death matter. So to answer your question, your honor, it would be a three-step process in special interrogatories on the verdict. So just to back up, so you mentioned the third step was kind of the step I asked you to assume at the beginning. If you have a greater than 25% chance of survival, then you still have to prove, obviously there was a breach of the standard of care, that that breach increased the risk to Mrs. McNeely. And then do you agree that you have to prove that that increased risk was a substantial factor in bringing about the ultimate injury? Yes, and that would be what we call special interrogatory number two. And that is a jury determination, because in West Virginia case law, the statute, there is no bright line rule or guidance on what is considered a substantial factor. But if you look at the common law, that is a jury question under the negligence law. Can I ask a question? Yes, your honor. Is that essentially a different way of saying proximate cause? So, you know, your honor, the loss of chance theory in West Virginia is what's been looked at as a relaxed causation approach, meaning that it eliminates the traditional proximate cause approach. And you just focus on those two prongs. The loss of chance is divided into two prongs. It eliminates the traditional notion of proximate cause. But yes, it is another way of proving causation under the MPLA in West Virginia. So just to clarify, the substantial factor, proximate cause, is separate from the greater than 25% chance of survival if everything had gone right. Those are two separate inquiries. Absolutely. And you can see that in the statute, your honor, and in the Davis decision that was cited by the district court in his opinion. Judge Berger, the district judge in that case, came straight out and said, listen, plaintiff has this, but they then also have the burden of proving, you can see in the statute, to a reasonable degree of medical probability, which calls for your expert to come in and say greater than 25% chance of survival. Okay. So in other words, what this statute says is that if everything went right and you still had a less than one in four chance of surviving or doing well, you can't file a loss of chance lawsuit, right? And to put that in fact, in this case, your honor, if you look at when she was supposed to be transferred, if they would have followed the standard of care, she would have had 39.17% chance. So she had a greater than 25%. If my expert would have come forward and said, you know what? She was so far gone. She had a 23% chance of survival at that point, if they would have followed the standard of care. Case is over. Right. Thank you. And so- That's pretty much the whole case right there, isn't it? It is, but I'm sorry. I think I cut the judge. No, that's all right. I'm used to being cut off. I think Judge King was getting right back to the question. I apologize. Your asserted problem is that Judge Faber failed to understand or apply that 25% figure in the proper way. Well, he read the two prongs together, your honor, and he defined his own. He took the case law. I mean, the statute, to me, is just clear. There's two prongs to it. You have two ways to go, improved recovery, survivability, but he took it upon himself to define substantial factors, which the West Virginia legislature, the statute doesn't do, and no case law in West Virginia does either. Now, I will admit, though, there are courts around the country that have taken that leap, but we don't have that in this situation. Didn't he do it the same way your expert did it? He took my expert's loss of chance calculations, but then did not apply it properly to the clear language of the statute, and that's one of the errors that I want to talk about with the court, is I've kind of broken down the errors of the district court into three areas, interpretation, application, and rationale. So, when you look at the court's interpretation, you can find that. Now, this court, is this court interpreted and applied by the Supreme Court of Appeals of West Virginia? It has not, your honor. It has not been interpreted and applied. It's been interpreted and applied to other district courts, federal district courts in West Virginia. I don't think it's been interpreted and applied, your honor. It's just been briefly discussed, is how I would say. How about by the circuit courts in West Virginia? I have not found any opinions that do that, and I will just be blunt, your honor. The medical malpractice attorneys in West Virginia rarely use that, but as a young lawyer, I decided I was going to use it, and pleaded in my complaints. Has anybody ever, or did anybody ever propose to judge Faber that your issue ought to be, this issue ought to be certified to the Supreme Court of Appeals? No, your honor. Actually, they did not. Like I said, that would be a case of... Including yourself. You didn't make any proposal. No, your honor. All right, and the other side didn't make any such proposal. No, not from the record. But it was strictly a state law issue, right? The application of state law. Absolutely. I will say, though, that in my research before this argument, this court has, back in 1966, touched briefly on the loss of chance theory, but didn't get into any 19... In 1966, you say? Yeah, there's an opinion called Hicks versus U.S. that I was, in my research, that I found that where you all discussed... I'm sorry. Was that a tort claim case? You're exactly right, your honor. A tort claim case, and who on the Fourth Circuit wrote an opinion? Your honor, if you give me one second, I can tell you. I thought you'd be able to tell me right off the bat. Well, this loss of chance theory has been floating around for a long time in West Virginia. Actually, your honor, it did not come into them until 1983 with Thornton versus CAA. Fourth Circuit in 1966. Yeah, they reviewed a case out of Virginia. Oh, they did? Yeah, Federal Courts Claims Act, where a Navy officer's wife had died at the military compound, and they brought a claim regarding that. Well, Thornton is the case where the word substantial came out. The court used the word substantial in Thornton. I think that's how it sort of worked its way into the statute. Yeah, exactly right, your honor. Thornton talked about the substantial factor and how it increased the risk of harm. And then later, in 2003, came the enactment of the loss of chance statute. Judge King, did you have something else? I'm waiting. You were going to tell me who wrote that opinion. Oh, man. Don't you waste time on that. That's fine. But it's a 1966 case. We all find it. Soboloff? Simon Soboloff? Sure. Proposition that he said in that case, your honor. He said, if there is any substantial possibility of survival and the defendant has destroyed it, the defendant is answerable to them. So, I kind of like the proposition. It didn't have that 25% thing in it, though. No, it did not, your honor. Okay. Is that the unique thing about the West Virginia question? Yes, your honor. It created that separate burden that, as you know, would be a separate special interrogatory on the verdict form. And so, you'd have a three-step process, I was telling Judge Russel, and that was a unique one. Yeah. Okay. Your honors, like I said, if you just look clearly at the interpretation, the application, and the rationale behind it, you cannot reach the result that the district court did. But the one thing I want to also point out, your honor, when he denied my motion to alter amend, he took it upon himself to define substantial factors. The district court concluded, and this can be found on page 227 in the appendix, that the 25% language was to ensure that the alleged negligence was indeed a substantial factor. And as I was talking with Judge Russel, there is no bright-line rule or guideline to talk about substantial factor in West Virginia yet. Nobody's taken that leap. And in fact, if we look at the Davis opinion that the district court cited- Then why should we be doing this for them? I'm sorry? This is a federal court. It's a federal appeals court. We don't make West Virginia law. We apply it if we can figure out what it is. Absolutely. And that tells us what it is. So, the law in this case is easy, your honor. When you look at the facts and the application of that to the law, Ms. McNeely had a 39.1% chance of survival if BRMC, the appellee, would have followed the standard of care. We met prong two. We met prong three on the verdict one. Prong two would have been for the jury to determine about the substantial factor. And so, we respectfully submit, your honors, that the district court committed reversible error and abused its discretion when it did not apply the clear and unambiguous language of the West Virginia law substantive statute. And I see my time is up, and I'll address any more questions on rebuttal, your honors. Thank you, Mr. Byrd. Thank you, Judge King. Mr. Fox. Okay, thank you, your honor. My name is Sam Fox. I'm an attorney with the law firm of Clarity since Wabanaso here in Charleston, West Virginia. And I represent the Appellee Bluefield Hospital Company, DBA, Bluefield Regional Medical Center. Before we get into the argument, there are a couple of facts that I do think we need to, I'd like to add to the case. This patient was a 78-year-old female who had approximately a 20-year history of coronary artery disease and lung problems. She had a coronary artery bypass graft along with multiple stents placed in her coronary vessels. On March 10th of 2016, at approximately 145 in the morning, she presented to the hospital's emergency department where she was assessed and evaluated and admitted to the hospital. Later that same day on March 10th, she was evaluated by a cardiologist, the co-defendant, Dr. Dar, in this case. Dr. Dar and the patient decided that the patient needed to undergo a cardiac catheterization. The catheterization was performed and following the catheterization, the patient was admitted to the hospital overnight. There's no criticism in this case of the performance of the cardiac catheterization. The criticism comes the following afternoon when plaintiff's experts critical of Dr. Dar for not ordering the transfer of this patient sooner and for not transfusing the patient with packed red blood cells sooner than what occurred. Later that evening at 935, there was order to transfer the patient. A call was made to Roanoke for the patient to be transferred. The helicopter, earlier somebody asked about the helicopter flying from Bluefield to Roanoke. Actually, the helicopter flew from Roanoke to Bluefield to pick up the patient and then back to Roanoke. That occurred, the patient was accepted by Roanoke at 2240 or 1040 in the evening. Life flight came from Roanoke at 2252, arrived at the patient at 2331. So that would have taken, trust me, 39 minutes for the patient for the transport team to get from Roanoke to the hospital to Bluefield. The transport team remained with the patient for 34 minutes providing care to the patient at Bluefield and then took another 48 minutes to transport the patient by helicopter back to Roanoke and arriving at 1253 in the morning. Were there any weather issues or anything like that? No, there were not weather issues, Your Honor. So at the conclusion of the discovery in this case, we moved for summary judgment and the basis for our summary judgment motion was the fact that plaintiff had failed to produce any expert testimony proving that the hospital, my client, that there was any proximate cause between the alleged deviation from the standard of care and this patient's ultimate death. Plaintiff's sole expert on standard of care and causation, as Mr. Burt has pointed out, is Dr. DiNardo. He prepared a report on April 12, 2019, which was a six-page report, 10 paragraphs in the report. Only two paragraphs dealt with my client, Bluefield Regional Medical Center. He was then deposed on July 5, 2019. And during the course of that deposition, again, he offered no proximate cause opinions with regard to my client. So neither in his report or in his deposition did he ever testify or place in writing that in his report that the hospital... So, counsel, can I ask a question? Certainly, Judge. So the judge ruled on the 25% part of the statute? That's correct. So let's talk about that. What's your response to your counsel on the other side's suggestion that your reading or the district or the judge's reading of the collapses substantial factor in with 25%? Certainly, the substantial factor is an issue that the plaintiff, the appellant in this case, just totally ignores throughout this entire case. In fact, when the question was asked by you earlier today, and Mr. Burt addressed the statute and how it would appear in front of the jury, again, the word substantial factor was omitted. And Judge Faber in the district court got this exactly correct because he made the point that without utilizing the substantial factor in this case, you could have a situation where there's an expert testimony that the patient, due to despite the negligence, the patient still may have had a 24.99% chance of survival. So it's totally irrational and illogical to allow... You're not... I think it doesn't mean the person wins their case. They still have to prove to the jury that that was a substantial factor in causing the injury. And you would have a great argument that that very small reduction in or increase in risk or reduction in chance suggests it wasn't a substantial factor. Well, that's a legal question that's certainly ripe for a district court judge or a trial judge to deal with because if they can't even prove that the difference in the outcome was greater than 25%, then it never should be presented to a jury in the first place. So in this case... I have a question about 25% change in outcome. So obviously that's not what the statute says. So I'm just going off what the district court said here. But if we're looking for a 25% change in outcome, it looks to me like the district court's math is wrong, right? Because the district court subtracted the two percentages from each other and called that a percentage change. That's not. That's a change in percentage points, right? 25% of 39% is 14%. And if you subtract 14.17 from 39.71, that's 29.3775%. So the district court didn't take... Sorry for all the numbers. But my point is, the district court didn't measure a 25% change in outcome. The district court subtracted two Do you follow me? I believe so. I was never very good in math, Judge. But I will tell you this, that to this point, there's been no dispute among the parties over Judge Faber's calculations in this case. In fact... Well, I guess my point is not that we're going to reverse him on faulty math, but it's that if he's creating a 25% change in outcome rule, which is not in the text of the then perhaps the rule that was applied is the one that's absurd. Because the smaller your chances are, the smaller absolute change you have to show. It still only has to be 25% of what your chances were. And if that's the rule, that doesn't make much sense. Well, the testimony in this case is that if the standard of care had been met, the patient would have had a 39.17% chance of survival at 10.35 in the evening. The patient was ultimately received at Ronit Memorial Hospital at 12.53 in the morning. And at that point in time, using the plaintiff's expert's own calculations, the patient had a 16.17% of survival. Therefore, nothing that the hospital did or didn't do prevented the patient from having that that 16.17% chance of survival. So it's certainly reasonable... Mr. Fox, let me just ask you a question about the point that Judge Rushing made. This statute says that what they have to prove is that if the care had been acceptable, the patient would have had a greater than 25% chance of survival. So in other words, this statute says, the way I read, that if you're pretty much of a goner, if you have less than a one in four chance of doing well or surviving, you can't bring a loss chance case. But if you have greater than that, you do. And that's pretty much what the plain language of the statute says, isn't it? Well, Judge, that's what the statute says. But the text of the statute is not clear, however. It needs to be... Mr. Fox, this business of substantial comes in a preceding clause. And the adjective substantial refers to the decrease of likelihood of a good result or the increase of the likelihood of a bad result. But it doesn't relate to the 25% rule that's in the last clause of the statute. Well, Judge Berger from the Southern District of West Virginia, in the Davis case, she has indicated, which was a Federal Tort Claims Act case, she indicated that, in essence, the substantial factor concept now has a statistical minimum standard of proof. And the history of the loss of chance in West Virginia, Your Honor, is the Thornton v. CAMC case in 1983 established loss of a chance. And it used the terminology contained in the first clause of this statute, talking about increased risk of harm, must be a substantial factor, etc. And then in 2003, when our legislature revised our Medical Professional Liability Act, it added, and I think tried to provide some meat to the bone, so to speak, this greater than 25% chance of improved recovery or survival. And that's what the Federal Bunner case has essentially agreed with. And so, for instance, in the Bunner case, which was another Federal Tort Claims Act case, Judge Johnston, as well as plaintiff's expert in that case, and plaintiff's attorney, all utilized the terminology. The question was posed to plaintiff's expert, had the standard of care been followed in this case, can you say to a reasonable degree of improved outcome? And the answer was yes. So throughout that decision, the Bunner case, which was a 2016 case, the terminology of better outcome, improved outcome is certainly used in that case and utilized. And it's only a common sense approach in trying to determine what the outcome would be. So as Judge Faber has indicated in both of his orders, which appellant is appealing here, you could have the situation of 25.01% and then 24.99%, and everybody would agree that's not a substantial factor. It's 2.01% of a percentage point. So the plaintiff should not be allowed to proceed if they do not prove that the difference in outcome would exceed 25%. It's just, you know, the appellant in this case would have you take a snapshot in time and look at... That's just not what the statute says. Well, the statute doesn't go into detail with regard to how this calculation should be made. You're correct, Your Honor. Well, no, the statute says pretty clearly that you can't recover if you wound up with less, if under optimal circumstances or at least reasonable circumstances, you would have wound up with less than a 25% chance of recovering or surviving. That's what the statute says. Well, the statute says that following the standard of care would have resulted in a greater than 25% chance that the patient would have survived. And the issue for this court and what Judge Faber was faced with is how do you determine that greater than 25% chance? Well, you get experts to testify about it. You know, you can get experts to testify about anything and apparently they'll put a number on your chance of survival. And as Judge Rushing pointed out, you might lose the case if it's such a de minimis amount of malpractice or you might not get a lot of money. But, I mean, the 25% is kind of like a speed limit. It's, yeah, it's an arbitrary number, but that's what statutes do sometimes. And this is one of those times. Yeah. And Judge, you're exactly right. And oftentimes you can get experts to say many, many things. But in this case, we're dealing with the plaintiff's own expert witness who testified about the percentage of survivability at one point in time and then a percentage of survivability at another time. You'd think that... He said it was going to diminish around 10% per hour, didn't he? He said every hour that the patient wasn't transferred, it diminished by 10%. That's correct, Your Honor. And he started at what, 50%? He started at, well, if you do the calculations, it was 49.17%. And then his testimony was the patient need to be transferred within one hour and that would have met the standard of care. So you get down to 39%. Did anybody ask him if the 10% was 10% of 100% or 10% of 49.1%? That question was not asked. So, you know, and then... But we don't know what he... Well, following the deposition or at the end of the deposition, plaintiff's counsel did not ask... We know that at the end of the whole thing, after the acceptance, that following the accepted standard of care would have resulted in a greater than 25% chance that the patient would have improved recovery or would have survived. So when they got to Roanoke, does that mean that she would have needed to have something better than one in four chances of living? Well, when she got to Roanoke and the testimony is that she had a 16.17% chance of survival. So the court in this case... Rather than 10% of 49%. I don't think the order from Judge Faber actually goes into detail about that. But what Judge Faber did was subtract that 16% from the 39% and comes up with 23%, which is less than the number in the statute. And that's the basis for his granting of summary judgment in this case. Right. Again, the plaintiff in this case... He calculated and you're supporting the proposition that when she got to Roanoke, she only had a 23% chance of surviving. That's correct, John. Yeah. And it's certainly reasonable to look at the change in outcome because that's... My client shouldn't be held responsible for the 16% that when the patient got to Roanoke, that should not be... That should be... The patient had that by the time the patient got there. Your client is the Bluefield Medical Center. You're saying they didn't cause any delay. That's correct, John. That's correct, John. So, you know, I see that my time is running down. If you look at the cases of Bunner v. U.S., Davis v. U.S., and Wilkinson v. U.S. Again, now, those three cases come from other district judges in southwest Virginia? That's correct. Bunner's from Judge Johnston. Davis is from Judge Berger. And Wilkinson's from Judge Copenhagen. And especially Judge Johnston and Judge Berger's discussion in Bunner and Davis is especially interesting. As I've read to you earlier, they talk about improved outcome. And Judge Berger in particular ties the substantial... To be clear, it does say a greater than 25% chance of a better outcome. But that's pretty much what the statute says when it's not talking about death, right? When it's talking about recovery. A 25% chance that the patient would have an improved recovery. Not 25% greater recovery. They're not measuring their recovery. They're just saying a 25% greater chance that things would have been better. That the result would have been better. So I'm not sure that... I mean, again, I know Briner's just a district court opinion, and they don't actually analyze the statute. But I still... I think you're really... You're over-reading it. Okay. Well, as I indicated, and Judge Faber cited these cases as well in his order. And he felt that the improved outcome language in the Davis case, in the Bunner case, was especially interesting and supportive of his position in the McNeely case, in the Grant case. So, you know... Did you think... I'm going to ask you what I asked a colleague here. Did you all think about trying to certify this as Supreme Court? No, we did not, Your Honor. We filed our motion for summary judgment, and the judge granted that. So, no, we did not discuss certifying the question to the Supreme Court. That's correct, Your Honor. That's correct, Your Honor. So, again, as I see my times winding down, based upon today's argument, as well as our previously filed briefs in this case, we would respectfully request that this court affirm the district court's December 19, 2019, granting of our summary judgment, as well as affirm the June 25, 2020, denial of the plaintiff's motion to reconsider. Thank you very much. Thank you, Ms. Fox. We appreciate it. Okay. Thank you. Mr. Byrd? Yes, Your Honor. I just want to make a few points on, especially some comments made by Judge Rushing and by the counsel. First and foremost, if you look at Bunner, Bunner does not stand for a change in condition. Bunner stands for the proposition, and it is actually stated clearly, as Judge Rushing pointed out, chance of an improved outcome or an improved recovery. It does not talk about change in condition. Also, if you note in that case in footnote 17, the judge talks about how the 25% language is a threshold that has to be met. I would just submit, Your Honors, that the Wilkinson case, the Davis case, and the Bunner case do not stand for the proposition of how the footnotes 8 and 10 were granted. It specifically states this. The court interprets West Virginia Code 5573, which is the law of the land, as requiring a 25% change in outcome between the chance of survival had the standard of care been followed and the chance of survival experienced due to the breach of the standard of care. There is not one case, one statute, the language in the just look at the plain facts of this, at the time that the standard of care should have been followed by the appellee, Ms. McNeely would have a greater than 25% chance of survival. It would have been 39.17 based upon the court's calculation. Now, I have to point out what Judge Rushing said because it is an important point. The court used the difference between had the standard of care been followed and the time that she arrived at Roanoke because of the breach showing that there was a 23% decrease. That is for counsel to argue before a jury whether that was a substantial factor. That increased the harm. They couldn't stop my client's bleed, so it increased her harm, which led to her ultimate injury. So when the jury hears that, they're going to have to decide whether that 23% will. Is that a substantial factor in bringing about her ultimate injury? That is for the counsel to argue to the jury, as Judge Rushing properly pointed out. So, on behalf of the appellant, if you follow the clear language of the statute as we've submitted, the ruling that makes sense is that this is, I mean, she met prong two that I discussed with Judge Rushing earlier. Her chance of survival at 1035 when the standard of care had been followed was greater than 25%. End of story. Prong one of the loss of chance statute submitted to the jury. So, the appellant is simply asking this court to recognize that there was a fundamental flaw in the district court's rulings that without any correction by this court would lead to an equitable result to the appellant. And so, I just ask. Now, what happens at 1035? What do you say? 1035, your honor, is if the standard of care would have been followed, she should have been at Rona. And that, and those standards, the West Virginia cardiac catheterization standards, which are addendum to my brief, they were. Well, they could, on the record here, they couldn't have flown that helicopter back in and out. Well, your honor, and I know that's not in the record, but in deposition testimony, the policies and procedures that the appellee, they're required to have a helicopter at one of the local airports, if I remember, but I don't believe that that happened. But that wasn't, that was outside the record and outside the consideration of the judge. But yes, you're right, your honor. 1035 is the time. It is the brief. If the standard of care would have been followed, I'm sorry, if the standard of care would have been followed, she should have been at Rona. And she would have had a 39.17% chance of survival, which is greater than 25%. Your honors, I appreciate it. And we just ask that the court remand it and that the appellee be named as a defendant and we move to trial. Thank you very much, Mr. Byrne. Thank you, your honors. If we were in Richmond, we would leave the bench now and the three of us would venture into the well of the court and shake hands with each of you and thank you for your work. But maybe next year. Maybe next time. Thank you, your honor. We appreciate it, your honor. Good to have you. Yeah. Thank you.
judges: Robert B. King, Allison J. Rushing, John A. Gibney Jr.